**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| YVETTE CORRY,<br><br>                   Plaintiff,<br><br>          v.<br><br>THE NEW JERSEY JUDICIARY, *et al.*,<br><br>                   Defendants. | HONORABLE KAREN M. WILLIAMS<br><br><br>Civil Action<br>No. 20-15999 (KMW-SAK)<br><br><br>**OPINION** |

APPEARANCES:

ANDAIYE AL-UQDAH, ESQ.
106 NORTH WARWICK ROAD
LAWNSIDE, NJ 08045

NIXON TEAH KANNAH, ESQ.
5015 GERMANTOWN AVENUE
PHILADELPHIA, PA 19144

        *Counsel for Plaintiff Yvette Corry.*

TAMMY MAXEY, ESQ.
ERIC INTRIAGO, ESQ.
OFFICE OF THE ATTORNEY GENERAL
25 MARKET STREET, P.O. BOX 112
TRENTON, NJ 08625

        *Counsel for Defendants the New Jersey Judiciary a/k/a Superior Court of the State of New Jersey, Gloucester Vicinage, Ann Marie Cohen, Mary Kate Baehr, and Karen Gardner Duncan.*

**WILLIAMS, District Judge:**

## I.      INTRODUCTION

Plaintiff Yvette Corry ("Corry") brings this action against the New Jersey Judiciary, Ann Marie Cohen, Mary Kate Baehr, and Karen Gardner Duncan ("Collectively Defendants") alleging that the Defendants discriminated and retaliated against her based on her age, race, and disability in violation of N.J. Stat. Ann. §10:5-12, the New Jersey Law Against Discrimination ("NJLAD") and 42 U.S.C. § 2000e ("Title VII") while she worked in the Gloucester Vicinage as a Judicial Clerk.[1]

This matter comes before the Court on Defendants' Motion for Summary Judgment, (ECF No. 36). Plaintiff opposes this motion, (ECF No. 42). For the reasons that follow, Defendant's Motion for Summary Judgment will be **GRANTED**.[2]

## II.     BACKGROUND

### A.  Factual Background

This matter stems from Plaintiff's allegation that during her almost 15 years of employment and numerous applications she never advanced from Judicial Clerk II to Judicial Clerk III. Plaintiff is 53 year old African American woman. (ECF 36, Defendants' Rule 56.1 Statement of Material Facts "DSMF" at ¶2). She started her employment at the Judiciary in 2009 as a "Judiciary Clerk 2" in Cumberland County and transferred to Gloucester County in 2014 and performed in the same capacity. (*Id.* at ¶¶3-4, 9).

---

[1] Based on the Complaint and the record before this Court, Plaintiff does not allege an Age Discrimination in Employment Act ("ADEA") claim. The Court construes Plaintiff's arguments regarding age as an attempt to support a hostile work environment claim which cannot be brought under Title VII. To the extent that Plaintiff attempts to argue an ADEA claim in her Opposition, the Court notes that "[a] plaintiff cannot raise claims for the first time at the summary judgment stage, if they were not included in their Complaint," and therefore the Court will not address it further here. *See Conseco Life Ins. Co. v. Heady*, No. 11-3716, 2013 WL 3285065 at *4 (D.N.J. Jun. 26, 2013).
[2] Pursuant to Local Civil Rule 78.1(b), this motion will be decided on the papers without oral argument.

2

Plaintiff's direct supervisors at Gloucester County were Defendant Annie Marie Cohen ("Cohen") and Defendant Mary Kate Baehr ("Baehr"). Defendant Karen Gardner Duncan ("Gardner Duncan") is the Assistant Civil Division Manager for Gloucester County and the direct supervisor of Cohen and Baehr. (*Id.* at ¶¶5-6). Plaintiff's claims of race based hostile work environment and retaliation largely overlap, and the Court will limit the recitation of the facts solely to those that relate to those claims.

Plaintiff applied for the Judicial Clerk III position numerous times while working in Gloucester County and consistently scored low on her application. (*Id.* at ¶21). However, Plaintiff contends that she was denied advancement to Judicial Clerk III because of her race and in retaliation for complaining about the discriminatory treatment she perceived occurring in the workplace. Specifically, Plaintiff describes the following conduct as racially based:

- On her first day of work in Gloucester County, Cohen accused Plaintiff of taking a co-worker's coffee cup when in fact, that co-worker gave the cup to Plaintiff. Plaintiff felt that Cohen accused her of theft and that this accusation was racially motivated. (Plaintiff's Statement of Material Facts, hereinafter "PSMF" at ¶¶13-14).

- Cohen reprimanded Plaintiff in front of others, asking plaintiff are "you dum[b], stupid, or just can't learn." (PSMF at ¶¶15).

- Gardner Duncan's directive to Plaintiff to remove a tam and expose her hair loss, which Plaintiff believes "was racially motivated and that there is racism between individuals of the same race." (PSMF at ¶33).

- Plaintiff asserts that she made an internal complaint where she suspected that Defendant Gardner Duncan was not allowing her to advance "because [she's] black, I guess." (DSMF at ¶26).

- Plaintiff complained of various incidents of discrimination between September 17, 2015 and October 15, 2015, that generally asserted that Plaintiff believed Cohen's attitude was discriminatory, that Cohen was discriminating against another employee, among other claims seemingly unrelated to race. (DSMF at ¶38).

- Plaintiff believes that she was continuously denied promotion to Judiciary Clerk III because she did not receive "CourtSmart" training, and that she was denied this training due to her race. (PSMF at ¶¶34, 35); (DSMF at ¶26); (PRSF at ¶¶19-21).

- Plaintiff alleges that a white woman named "Anastasia" received CourtSmart training, had less experience and was promoted to the Judiciary Clerk III position, (PRSF at ¶20).

- Defendants assert that the training was not required to be promoted and note that Plaintiff had interviewed for the role of Judiciary Clerk III numerous times without taking the training but was unsuccessful due to other issues, such as other candidates scoring higher on their assessments. (DSMF at ¶¶10-17, 20-21, 23-26).

However, at no point in her tenure in Gloucester County did any coworker use any racial epithets against her. (*Id.* at ¶45). These complaints were reviewed by the Judiciary's EEO officer and were found to be unsubstantiated. (*Id.* at ¶¶39-43).[3] On August 27, 2018, Plaintiff submitted a lateral transfer request form that stated she felt she had a "hostile work environment," but she told

---

[3] As Defendants note in their Reply Brief (ECF No. 45 at 2), Plaintiff's responses to DSMF did not provide any citation to the record, specifically for paragraphs 33, 34, 39-43 as required by the L. Civ. R. 56.1(a) and as such will be considered by the Court as admitted.

the EEO officer in a follow up interview that she was not receiving hostility due to a protected characteristic. (*Id.* at ¶44).

### III.    LEGAL STANDARDS

#### A. Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with 'specific facts showing that there is a genuine issue for trial.''" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256-57. "A nonmoving

5

party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

IV.    DISCUSSION

A. **Plaintiff's NJLAD Claims**

Defendants contend that they cannot be sued in federal court under the New Jersey Law Against Discrimination ("NJLAD") because the Judiciary and its employees are immune from such suits. (ECF No. 36 at 5-7). Plaintiff concedes that the Judiciary is immune, however posits that the individual Defendants are not entitled to such immunity and are liable for aiding and abetting under NJLAD. (ECF No. 42 at 5-6). Thus, this Court's review is limited to the claims against the individual defendants.

Interestingly, Plaintiff correctly argues that "individual liability under the NJLAD requires a showing: [T]hat the aider and abettor acted in relation to a principal [(here, the employer.)] . . . Once [the employer] has been found liable, the issue becomes whether under §12(e), any employee is liable to aiding and abetting. N.J.S.A. 10:5-12(e). Employees are not liable as aider and abettor merely because they had some role, or knowledge of involvement. Rather, the degree of involvement, knowledge and culpability required as a basis for liability is heightened . . . [and must be] above mere knowledge and or implementation, lest a reverse superior liability could be created under the guise of aiding and abetting." (ECF No. 42 at 5) (citing *Fallia v. City of Passiac*,

146 F.3d 149, 158 (3d Cir. 1998). The Court notes that this is the very provision that precludes individual liability in the instant case.

Crucially, courts in this district routinely dismiss NJLAD claims against state employees because "individual liability does not exist under the NJLAD absent evidence that the individual was 'aiding and abetting' discrimination by the employer [and] [s]uch proof is impossible if the Court has no jurisdiction over the [state] employer." *Id.* at *30, (quoting *Hughes v. State of N.J., Off. of Pub. Def./Dep't of Pub. Advoc.*, No. 11-01442, 2012 WL 761997 at *3 (D.N.J. Mar. 7, 2012); *see also Hurley v. Atl. City Police Dept.*, 174 F.3d 95, 138 (D.N.J 1999) (Cowen, J., concurring in part); *Hicks v. State of N.J. Dept. of Corr.*, No. 16-0927, 2017 WL 4858122 at *4 (D.N.J. Oct. 27, 2017); *Shreve v. N.J. Motor Vehicle Comm'n*, No. 15-7959, 2016 WL 5334661, at *5 (D.N.J. Sept. 22, 2016); *Mitchell v. N.J. Lottery*, No. 04-896, 2006 WL 1344092 at *12 (D.N.J. May 15, 2006); *Hanani v. State of N.J.*, No. 03-3111, 2005 WL 1308231, at *16 (D.N.J. May 31, 2005). Moreover, as discussed in *Fallia v. City of Passaic*, "it is fundamental to aiding and abetting liability that the aider and abettor acted in relation to a principal, here, the employer, the city. Once the city has been found liable, the issue becomes whether . . . any employee is liable for aiding and abetting." 146 F.3d 149, 159 (1998). The Court agrees with the majority and finds this reasoning persuasive.[4]

Here, because all of the allegations against Cohen, Baehr, and Gardner Duncan are alleged to have occurred as employees of the New Jersey Judiciary and because it is undisputed that the New Jersey Judiciary cannot be held liable because it is entitled to Eleventh Amendment

---

[4] Plaintiff's reliance on *Dennis v. Sparks*, 449 U.S. 24, (1980) is misplaced because *Dennis* held that private defendants conspiring with a state actor were individually liable under §1983 despite the Judge's immunity from suit because the private individuals were found to be "acting under the color of state law," as cognizable under §1983. *Id.* at 27-29. In contrast, the instant case brings a state law claim regarding discrimination and retaliation against the individual employees, not a §1983 claim. Thus, the Court believes that the facts of this case are sufficiently distinguishable from *Dennis* and declines to apply its reasoning to the instant case.

immunity, the individual Defendants cannot be said to have aided or abetted, or "acted in relation" to the principal. Therefore, the Court grants Defendants Motion for Summary Judgment as to Plaintiff's NJLAD claims in their entirety.

### B. Plaintiff's Title VII Claims[5]

Now, the Court will turn to Plaintiff's Title VII claims for hostile work environment and retaliation.

    i. Hostile Work Environment

At the summary judgment phase, Plaintiff bears the initial burden of establishing a *prima facie case* of a hostile work environment claim. *Charles v. Mott's LLP*, No. 17-2879, 2018 WL 2002794 at \*3 (D.N.J. Apr. 30, 2018). To establish a *prima facie* claim of a hostile work environment claim under Title VII, a plaintiff must show that: (1) she suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was severe or pervasive; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for *respondeat superior* or employer liability. *Id.* Further, to maintain a claim for hostile work environment under Title VII, a plaintiff must how that the harassing conduct "is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." *Id.* "A court must analyze the alleged harassment by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

---

[5] Additionally, the Third Circuit has clearly prohibited individual liability under Title VII. *See Kanauss v. City of Burlington*, (D.N.J. Sept. 28, 2020) ("Individual liability is not permitted under Title VII. . . the Third Circuit has 'clearly foreclosed any possibility of individual liability under Title VII [and] [i]n foreclosing individual liability, the law within the Third Circuit is 'settled' and 'dispositive.'"). Therefore, to the extent that any of Plaintiff's Title VII claims are asserted against individuals, those claims are dismissed.

offensive utterance; and whether it unreasonably interferes with an employee's work performance. The discriminatory conduct must be extreme [enough] to amount to a change in the terms and conditions of employment. Unless extremely serious, offhand comments and isolated incidents are insufficient to sustain a hostile work environment claim." *Chinery v. Am. Airlines*, 778 Fed. App'x 142, 145 (3d Cir. 2019) (internal citations and quotations omitted).

Plaintiff baldly asserts, without any reference to any time frame, that she experienced racially discriminatory conduct that created a hostile work environment from when she was hired at Cumberland County until she retired from Gloucester County. However, it appears that the nature of her hostile work environment claim is based on the conduct of the named individual Defendants and their treatment of her during her employment at Gloucester County and the Court will limit its analysis to those facts.[6]

First, the parties agree that at no point during Plaintiff's tenure did any coworker use any racial epithets towards her. (DSMF at ¶45). Indeed, this Court is quite surprised by the barren record in this case, in light of the length of Plaintiff's employment. To this end, the Court cannot find, nor do the parties point to, any facts in the record to suggest that Plaintiff experienced intentional discrimination due to her race. That is to say, Plaintiff's self-serving statements are equivocal at best. *See, e.g.* (DSMF at ¶26) and (PRSF at ¶26). For instance, Plaintiff asserts that on the first day she felt that Defendant Cohen "accused her of theft because she was black," (DSMF at ¶28), yet a review of the record indicates that this so-called accusation came amidst a

---

[6] Plaintiff asserts, for the first time in her Opposition, that her supervisor Bob Smith "was holding her back" due to race and filed a complaint against him. *See* (ECF No. 42 at 10-11). There are no facts in the record that connect her experiences under Bob Smith prior to 2014 to the experiences she asserts occurred in Gloucester County. Thus, there is no "continuing violation" doctrine to connect the asserted violations in Plaintiff's Complaint. *See Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 165-66 (3d Cir. 2013) ("To allege a continuing violation, the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period."). In addition, the Court again notes that "[a] plaintiff cannot raise claims for the first time at the summary judgment stage, if they were not included in their Complaint," and therefore the Court will not address claims related to Bob Smith further. *See Conseco Life Ins. Co.*, 2013 WL 3285065 at *4.

misunderstanding over a coffee cup. (DSFM at ¶39). Other than Plaintiff's racial identity and that of Defendant Cohen, the record is devoid of any facts that this comment was in any way related to race.

Next, Plaintiff asserts that she made an internal complaint where she suspected that Defendant Gardner Duncan was not allowing her to advance "because [she's] black, I guess." (DSMF at ¶26).[7] Again, other than Plaintiff and Defendant Gardner Duncan both being "black" there is nothing else in the record that sheds light on the racial implications of Defendant Gardner Duncan's actions towards Plaintiff. Fatally, other than these two incidents, Plaintiff only asserts vague claims of mistreatment that do not refer to any protected class or category of discrimination. *See* (DSMF at ¶38).

Similarly, Plaintiff does not provide facts or point to any affirmative evidence that her working environment evinced discrimination that was severe or pervasive. For instance, the vague, nonspecific comments by Defendant Cohen, such as calling Plaintiff "dum[b], stupid," (PSMF at ¶¶15, 17), while unkind, are the type of "mere offensive utterance" that Title VII does not encompass. Moreover, the lack of temporal information related to these various offhand comments makes it impossible for the Court to truly ascertain the frequency or pervasiveness of Plaintiff's perceived discrimination. However, the conduct the Court can glean from the record is not so frequent to be pervasive nor extreme enough to amount to a change in the terms and conditions of employment.[8]

---

[7] The Court notes that Plaintiff seems to dispute this fact, and instead of agreeing that Defendant Gardner Duncan was preventing Plaintiff's advancement due to race, she seems to articulate that Defendant Gardner Duncan was actually preventing Plaintiff's advancement because Plaintiff filed unspecified grievances against her. (PRSF at ¶26).

[8] The Court notes that Plaintiff seems to allege that Defendants' failure to promote her during her time in Gloucester County was part of Plaintiff's perceived hostile work environment. However, the failure to promote cannot be aggregated into a hostile work environment claim. *See O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006).

To demonstrate that discriminatory behavior is sufficiently severe to establish a hostile work environment, a plaintiff must show that the conduct was severe, threatening or humiliating, based on racial animus and that such conduct and animus permeated the work environment to such an extent that it objectively altered the terms and conditions of her employment. *See Greer v. Mondelez Global, Inc.*, 590 Fed. App'x 170, 173-74 (3d. Cir. 2014) (noting in that case, plaintiff could only point to one racial incident and that the other alleged statements by colleagues were unprofessional "mere offensive utterances" and not severe, threatening, or humiliating conduct). For example, an inference of discrimination can be supported in a number of ways, such as comparator evidence, evidence of similar racial discrimination of other employees, or statements and actions, such as: being removed or dismissed from favorable shifts or tables in comparison to white colleagues, being partnered with only African American customers, being disciplined for specific conduct that other white coworkers were not punished for, being demoted and subject to more strict scrutiny demonstrated by specific incidents than other white coworkers, and being consistently heckled by colleagues with racist comments. *See Arku-Nyadia v. Legal Sea Foods, LLC*, No. 18-1089, 2020 WL 6111001 at *1-3, 5, 6, 8 (D.N.J. Oct. 16, 2020). Circumstantial evidence can also be derived from surrounding conduct, such as colleagues or management making racist comments to others or on social media, a colleague having a history of complaints of racial discrimination, and other coworkers corroborating such conduct. *Id.*

This stands in stark contrast to what Plaintiff has presented in this case. For example, while Plaintiff points to a handful of coworkers who allegedly received CourtSmart training with less experience and were promoted to the Judiciary Clerk III position, (PRSF at ¶22-24) there is absolutely no corroborating evidence or facts to demonstrate that such events actually occurred— and only one person, "Anastasia,"—was identified as white. (PRSF at ¶20). While Plaintiff asserts

3e 1:20-cv-15999-KMW-SAK   Document 46   Filed 05/31/23   Page 12 of 16 PageID: 451

that since she started working in Gloucester County the Judiciary Clerk III positions have gone to "younger white employees," (PRSF at ¶27), none of these employees have been identified, nor does Plaintiff give any additional context that is essential for the Court to know to assess her claims, such as: how many positions were available during this time, was the candidate pool diverse, were *all* Judiciary Clerk III positions given to white applicants, and what were the selected applicants qualifications in comparison to Plaintiff? These facts should have been developed through discovery, instead the Court has found more questions than answers in Plaintiff's submissions.

To conclude that Plaintiff made a *prima facie* case for a hostile work environment based on race would require the Court to embellish the facts of the record. While there may have been behavior between employees or directed at Plaintiff that was "hostile" in a colloquial sense, that is not actionable under Title VII. *See Edmond v. Plainfield Bd. Of Educ.*, 171 F. Supp. 3d 293, 309 (D.N.J. 2016). "Title VII is not a 'general civility code' . . . [n]or does Title VII protect 'offhand comments and isolated incidents.'" *Durand v. FedEx*, No. 12-7450, 2015 WL 140215 at *7 (D.N.J. Jan. 12, 2015).

Here, even after combing the record in the light most favorable to the Plaintiff, the Court finds only nonspecific and isolated incidents, spanning what appears to be years, where Plaintiff describes feeling unwelcome or being treated unkindly. Without more—facts tethering the conduct, statements, treatment, or behavior to Plaintiff's race, or a time frame that suggests that the conduct directed towards Plaintiff was severe or pervasive—Plaintiff has failed to establish a *prima facie* case of hostile work environment and therefore the Court must grant Defendant's motion for summary judgment on this claim.

ii.   Retaliation Claims

12

Next, Title VII prohibits an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII.]" *Hussein v. UPMC Mercy Hosp.*, 466 Fed App'x 108, 111 (3d Cir. 2012) (quoting 42 U.S.C. § 2000e-3(a)). Title VII retaliation claims are subject to the *McDonnell Douglas* three-part framework. *Charles v. Mott's LLP*, No. 17-2879, 2018 WL 2002794 at *4 (D.N.J. Apr. 30, 2018) (quoting *Anderson v. Boeing Co.*, 694 F. App'x 84, 88 (3d Cir. 2017)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The *McDonnell Douglass* framework requires a plaintiff to first establish a *prima facie* case of retaliation by showing that she (1) engaged in a protected employee activity; (2) suffered an adverse action (either contemporaneous or after the protected activity); and (3) that there is a causal connection between the employee's protected activity and the employer's adverse action. *Canada v. Samuel Grossi & Sons, Inc.*, 49 F4th 340, 346 (3d Cir. 2022). Next, if the employee can establish a *prima facie* case, the employer then has the burden of producing evidence that "present[s] a legitimate, non-retaliatory reason for having taken the adverse action." *Id*. Finally, if the employer carries this burden, the employee is then responsible for demonstrating that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id*.

The Court notes that Plaintiff establishes the first two elements of a *prima facie* case of retaliation. It is not disputed that Plaintiff engaged in a protected employee activity, namely filing various complaints to the Judiciary's EEO officer and union grievances. *See* (DSMF at ¶38); (PSMF at ¶34). It is also undisputed that Plaintiff had applied for the Judiciary Clerk III position

13

"numerous times" while working in Gloucester County but was ultimately unsuccessful. *See* (DSMF at ¶21); "Plaintiff applied for the Judicial Clerk III position at least 10 to 15 times." (PSMF at ¶38).

Here, Plaintiff's retaliation claim appears grounded in her failure to be promoted because she filed complaints and grievances against Defendant Gardner Duncan, and Defendant Garden Duncan thereafter prevented her from getting access to CourtSmart training for advancement, and sat on at least one interview panel that ultimately declined to promote Plaintiff to the Judicial Clerk III position. *See* (ECF No. 36 at Ex. M); (PSMF at ¶¶34, 35); (PRSF at ¶26); (DSMF at ¶26). In the light most favorable to the Plaintiff, her failure to be promoted to a Judicial Clerk III position, can and will be construed as an adverse action by the employer. *See* (ECF No. 36 at Ex. T).[9] These uncontested facts demonstrate a situation where a reasonable employee would have found the challenged action, here failure to promote, materially adverse, in a way that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *See Edmond v. Plainfield Bd. Of Educ.*, 171 F. Supp. 3d 293, 311 (D.N.J. 2016).

However, Plaintiff fails to show a causal connection between the employee's protected activity and her failure to become a Judicial Clerk III. "To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if unusually suggestive. When relying on temporal proximity, the plaintiff will also have to demonstrate that the decision maker accused of taking the adverse action had knowledge of the

---

[9] The Court notes that Plaintiff later asserts, in the same email thread, that she did not believe that Defendant Gardner Duncan was discriminating against her based on race. However, given the overall inconsistency with how Plaintiff has understood and presented her experience in the context of the record evidence, and given the fact that the Court is to construe all inferences in favor of the nonmovant at this stage, the Court will construe Plaintiff's specific grievance here as one of discrimination.

protected activity." *Edmond v. Plainfield Bd. Of Educ.*, 171 F. Supp. 3d 293, 312 (D.N.J. 2016) (internal citations and quotations omitted).

Here, in the singular instance where there is documented evidence of Plaintiff applying for the Judicial Clerk III position, only one month had elapsed between Plaintiff's complaint to the EEO Officer and being rejected for the Judicial Clerk III position.[10] *See* (ECF No. 36 at Ex. T); (*id.* at Ex. M). The Court concludes that the temporal proximity between the email to EEO officer and the November 2015 interview is suggestive of a causal connection. However, Plaintiff provides no facts at all to suggest that Defendant Gardner Duncan knew of Plaintiff's complaints. Although Plaintiff filed grievances with the union against Gardner Duncan, there is no evidence in the record that Gardner Duncan was aware of these grievances at the time she interviewed Plaintiff. (PSF at ¶¶34, 35), The lack of any record evidence suggesting that Gardner Duncan knew of any complaints against her *and subsequently pursued the adverse action of declining Plaintiff's promotion is fatal to her claim.* In fact, the record suggests that Defendant Gardner Duncan did not know of any of Plaintiff's complaints either to EEO or the union. In particular, Gardner Duncan's undisputed testimony is that the EEO complaints are kept confidential. *See* (ECF No. 36 at Ex. D, 16:18-18:1). These facts are simply too tenuous and cannot support a finding of a causal connection between the employee's protected activity and the employer's adverse action.

Even if Plaintiff were to establish a prima facie case, the Court finds that Defendants articulate a legitimate, non-retaliatory reason for its decision not to advance Plaintiff to a Judicial Clerk III. Simply stated, Plaintiff was not promoted because she was not the best applicant. Despite Plaintiff's assertion that she interviewed 10-15 times for the Judicial Clerk III position, the

---

[10] There is no evidence to suggest that any other individual defendants aside from Defendant Gardner Duncan were involved in the interviewing process for Judicial Clerk III, and therefore any claims related to the other individual Defendants with regards to Plaintiff's retaliation claim are dismissed.

undisputed record reveals only two instances that Plaintiff was interviewed. (PSMF at ¶38); (ECF No. 36 at Ex. M); (*id.* at Ex. N). In both instances, Plaintiff's scores were not among the highest out of the candidates interviewed. (DSMF at ¶¶21, 23, 24). Plaintiff does not contest this fact.[11]

Further, the record shows that Plaintiff was permitted to repeatedly apply for the Judicial Clerk III position despite not attending the CourtSmart training and she was provided interview skill development. (DSMF at ¶¶20, 25). Tellingly, the Judicial Clerk III position description is clear on its face that CourtSmart training is not required. (DSMF at ¶13). Here again, because the record is devoid of any facts that casts doubt on the legitimate non-retaliatory reason articulated by the Defendants to not advance Plaintiff to the Judicial Clerk III position, Plaintiff has again failed to meet her burden. In other words, Plaintiff has not demonstrated that Defendants' proffered explanation why she was not promoted to Judicial Clerk III was false, and that retaliation was the real reason for the adverse employment action. Thus, Plaintiff's retaliation claim cannot survive this motion for summary judgment.

## V.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 36) will be **GRANTED**. An order consistent with this Opinion will be entered.

May 31, 2023

KAREN M. WILLIAMS, U.S.D.J.

---

[11] The Court notes that Plaintiff does not dispute her scores but does dispute that the internal hires she was aware of had less experience. (PRSF at ¶¶ 23, 24). Because neither party has provided any evidence relating to what components go into the scoring, the Court cannot evaluate whether this assertion of less experience has any weight in relation to the scores in Exhibit M, nor can the Court confirm if any of the names Plaintiff provides in the PRSF were ranked against Plaintiff in this particular application cycle. Nevertheless, Plaintiff does not assert that her score is incorrect or that her scores were not, in fact, lower than other applicants.